HUDSON COUNTY COURT OF COMMON PLEAS.

MATTHEW J. SAVAGE, BY HIS NEXT FRIEND, JOSEPHINE ALEXANDER, PETITIONER-APPELLEE, v. OTIS ELEVATOR COMPANY, RESPONDENT-APPELLANT.

Decided January 29, 1947.

For the respondent-appellant, *Albert E. Schober.*

For the petitioner-appellee, *O'Brien, Brett & O'Brien.*

DREWEN, C. P. J.   Petitioner operated a milling machine in appellant's Harrison plant.   The working of the machine was such as to cause the accumulation around its base of metal particles, thrown off in quantities sufficient to require their disposal from time to time.   This was effected by means of compressed air, released from a hose, which blew the accumulation through an opening into a lower chamber designed to receive it.   Petitioner's machine was one of a number in the department, each having its own operator and each

equipped with a compressed air hose for use in the manner described. It was not the duty of the operator to remove the accumulation; that function was performed at all machines by one especially assigned thereto, in this instance one Brown. Each hose was equipped with a nozzzle and a "button." The pressing of the button released through the nozzle a column of air of ninety pounds pressure. The proof shows that while in the hands of Brown, either during the performance of his assigned duty at petitioner's machine or otherwise, the hose was so manipulated by Brown that the air pressure was discharged near enough to the side of petitioner's head to cause a puncture of the eardrum, with ensuing chronic discharge from the ear.

The accident is described in the claim petition as follows: "Petitioner was working at his machine when a fellow employee using an air hose accidentally blew it in petitioner's face and caused injury to his left ear." Though the allegations of the claim petition are thus grounded on accident, petitioner's evidence presents a case of horseplay. And the pleaded defense is that "Any accident suffered by petitioner was due to horseplay and did not arise out of and in the course of his employment."

Petitioner in his testimony seems strangely uncertain whether his version of the happening should be horseplay or accident. He gives it both ways. He contradicts himself and quibbles; but from what he told the nurse, the doctor, the investigator and others immediately and shortly following the occurrence, taken together with all attendant circumstances, there is no doubt in the mind of this court that horseplay it was. It may be that petitioner's equivocation was due to a consciousness of having participated in the foolery himself, but there is nothing to show that he did. The Deputy Commissioner likewise decided that the case presented was one of horseplay; and after a recital of proofs relating to the question of a foreman's knowledge of the prior misuse of the hose, he declares in his finding that "under these facts our cases have held that an injury received, even though in horseplay, is compensable." It is our opinion that the proofs disclose no evidence of such prior knowledge attributable to re-

spondent; and in the view we take of the case it is of no consequence whether it does or not.

The decisions in this state develop no final principle for application to this case. We must not be carried away by the term "horseplay," nor by assumptions of a rule that in cases bearing that label a showing is required that the employer was aware of conditions conducive to accidents like that which did result and that he failed to suppress them. The briefs argue this point with much earnestness, but upon texts gleaned entirely from *obiter dicta.* As indicated, there is no clear authority on the subject in this state. We are not unmindful of the decision of the Court of Errors and Appeals in *Hulley* v. *Moosbrugger,* 88 *N. J. L.* 161; 95 *Atl. Rep.* 1007, and of the very recent decision of the Supreme Court in *Budrevie* v. *Wright,* 135 *N. J. L.* 46; 50 *Atl. Rep.* (*2d*) 147, but those cases deal with horseplay in a thoroughly different sense. Here we have a dangerous instrumentality which is a feature of the working environment. It is attached to the machine at which the employee works. It is of such a nature that but slight deviation from its most careful use is enough to create peril for anyone nearby. The margin between safe and unsafe is so narrow that the potentiality for harm may be described as ever imminent. What this potentiality is should require no better illustration than the facts before us. There are cases in other jurisdictions that deal with the sportive use of an air hose upon a more drolly selected orifice, with resultant death to the jester's victim. Why in a case like this should the petitioner be required to show that the employer had knowledge of the previous misuse of the dangerous device? How many antecedent inflictions of harm must there be? The only effect of such previous knowledge is to inform the employer of a condition that calls for correction. But the employer here knew all there was to know about the evil possibilities of the air hose. The testimony places that beyond dispute. A foreman and an assistant foreman called by respondent both say that the strictest orders were given to all employees having access to an air hose against the misuse thereof, together with the warning that any resort to the hose in foolery or for any other purpose than its legitimate

and intended one would result in the offender's immediate discharge. The safety-man in the department where petitioner worked testified that he "knew that the careless use of it [the hose] might be dangerous to anybody in the neighborhood." In a word, common sense rejects the applicability of the rule of employer's prior knowledge to the facts in this record.

Consider the genuine difference between knocking a hat from a fellow-worker's head (*Hulley* v. *Moosbrugger, supra*), or the jostling about in a freight elevator while returning from lunch (*Budrevie* v. *Wright, supra*), on the one hand, and the discharge upon a fellow-worker of a powerful air-gun under circumstances like those in the present case, or the tossing upon a welding-flame of inflammable liquid used by workmen in the plant (*Staubach* v. *Cities Service Oil Co.*, 126 *N. J. L.* 479; 19 *Atl. Rep.* (2d) 882), on the other hand. We think there is a definite principle inherent in this distinction. In the first category injury is the luckless and unforeseeable result of conduct having relation to nothing in the work or the work's conditioning, while in the second category natural forces ingredient in the worker's equipment or environment, or both, are recklessly loosed from control and made free to pursue a devastating course they are but too likely to find. The present question comes down to this: Does the air-gun have so close a relation to the working milieu that injury resulting from its intentional misuse, so easy of occurrence and so vividly within the employer's apprehension, can be said to have arisen out of and in the course of the employment? We think it does.

But what, specifically and apart from all else, is to be said of that element of the case which comprises the truant behavior of a fellow employee, without which no injury would have occurred? In other jurisdictions throughout the country the clear declaration is made that where men work together in numbers, their employment is conditioned by human nature's irresistible penchant for monkeyshines. In the absence of express statement in New Jersey, it will not be amiss to quote what learned jurists elsewhere have said. Tn *Leonbruno* v. *Champlain Silk Mills*, 229 *N. Y.* 470; 128

*N. E. Rep.* 711; 13 *A. L. R.* 522, Judge Cardozo, for the New York Court of Appeals, said: "English cases hostile to the award \* \* \* are inconsistent, it would seem, in principle with later rulings of the House of Lords (*Thom* v. *Sinclair* [(1927), *A. C.* 127] \* \* \*. They are certainly inconsistent with the broader conception of employment and its incidents to which this court is now committed;" that the true facts of factory life must be recognized; that the apple victim "was injured, not merely while he was in a factory, but because he was in a factory, in touch with associations and conditions inseparable from factory life. The risks of such associations and conditions were risks of the employment;" that factories "have crowded contacts" and resulting injuries "are not measured by the tendency of such acts to serve the master's business," and that such horseplay arose out of the employment, as an incident thereof, and that innocent victims must be protected by compensation awards.

In *Cassell* v. *U. S. Fid. and Guar. Co.*, 115 *Tex.* 371, 392; 283 *S. W. Rep.* 127; 46 *A. L. R.* 1137 (1926), it is said that the court must recognize the "wellnigh universal human craving for fun \* \* \* we are forced to consider these pranks as a hazard which the employee required to work with others must encounter in the performance of his duties, and hence such pranks constitute a risk reasonably inherent in or incident to the conduct of the employer's business."

Chief Justice Remy of Indiana said, in *Chicago I. and L. Railway Co.* v. *Clendennin*, 81 *Ind. App.* 323; 143 *N. E. Rep.* 303 (1924): "It is a matter of common knowledge to employers of labor that men working together, or in near proximity to other workers, will indulge in moments of diversion from work to play pranks on each other." In *Malthais* v. *Equitable Life Assurance Society*, 93 *N. H.* 237, 242; 40 *Atl. Rep.* (2d) 837 (1944), Chief Justice Marble of New Hampshire said: "Such lapses are conditions incident to the service," and that participation is not a defense, as only those faults specifically named in the statute as a bar to recovery, such as serious and willful misconduct, are to be considered, and that the employee "was guilty at most of contributory fault."

In *Pacific Employees Insurance Co.* v. *Industrial Accident Commission,* 26 *Cal.* (2d) 286; 158 *Pac. Rep.* (2d) 9 (1945), Justice Edmonds of the Supreme Court of California said that considering "as we may, the propensities and tendencies of mankind and the ordinary habits of life, it must be admitted that wherever human beings congregate, either at work or at play, there is some frolicking and horseplay. Any doubt upon that subject  *  *  *  must be resolved in favor of compensability."

In *Gates Rubber Co.* v. *Industrial Commission,* 112 *Colo.* 480; 150 *Pac. Rep.* (2d) 301, 304 (1944), Chief Justice Young of Colorado said, concerning the non-participating innocent victim, that as to such a claimant the accident resulted from "the conditions under which the business is carried on." (The foregoing excerpts are taken from "Assaults and Horseplay under Workmen's Compensation Laws," issued by Law Society Journal of Massachusetts, Boston, August, 1946.)

While these pronouncements, stated as they are in the abstract, are not in harmony with the concrete holdings of the Moosbrugger and Budrevie decisions already cited, they are in fullest accord with the decision of our Supreme Court in *Giracelli* v. *Franklin Cleaners and Dyers, Inc.,* 132 *N. J. L.* 590; 42 *Atl. Rep.* (2d) 3. Indeed, that decision goes farther than they do, because it gives to a purely adventitious casualty suffered by an employee a complicity wide enough to include "human behavior as we find it," not only within the boundaries of the employer's establishment but beyond that, out into the circumambient world. In the Giracelli case the petitioner, a young woman, was manager of one of her employer's branch stores. A customer, coming there ostensibly to claim some garments that had previously been left for cleaning, pursued her into the rear room of the store and there ravished her. The injury sustained was declared to be compensable. The Supreme Court's theory of compensability was that the work, its location and the circumstances surrounding it, had exposed the employee to a possible fate like that she suffered. But in the present instance it can be said, and with plainer cogency of fact, that the employer, having selected petitioner's fellow worker, placed into his mischievous hands

an instrument whose mischievous use was wellnigh bound to do the harm it did, the eventuality itself being to the employer not entirely unforeseen. Thus, it seems to us, the distinction between this and the apparently contrary decision of our higher courts already considered, is completely demonstrated.

It is adjudged by this court that petitioner's injuries arose out of and in the course of his employment.

A careful examination of the medical proofs results in a finding that accords with that in the Bureau. The respondent sought to show an intervening efficient cause, that the injury resulting from the accident complained of was completely cured and that petitioner's present condition is due entirely to an injury independently sustained at a subsequent time. These are the facts: The attending specialist was Dr. Dias. He found that the perforation of the eardrum had healed and he discharged petitioner as cured. This was on June 8th, 1944, about a month following the accident. On June 20th petitioner returned to Dr. Dias with a renewed discharging of the ear and the doctor found that the drum head had broken down again with an abscess. The subsequent history of the specialist's treatment, which extended into March, 1946, is not presently in point. The controversy turns on the fact that when petitioner returned to Dr. Dias on June 20th he informed the doctor that on June 18th he had been swimming in Olympic Park Pool, in the City of Newark. It is to this incident entirely that the respondents would ascribe the present disability. The evidence justifies no such conclusion. The accident, the related injury, and the ensuing disability were all clearly established. To say that the incident of petitioner's swimming in a pool some forty-eight days thereafter must be taken as the supervening efficient cause would be the purest conjecture. Of course there ensues the usual dispute of physicians, but we are far more impressed with the testimony of those who ascribe the disability to the orginal injury, one of whom, Dr. Dias, is the only physician who actually attended petitioner throughout the long period of his treatment. The testimony of this physician is not contradicted, that when he again saw petitioner on June 20th the rupture of the eardrum had recurred and the place of the

new rupture was identical with that of the scar of the former one. And he said also that scar tissue breaks down. A swim in a pool is normal, ordinary exercise, though it evidently was too much for the predisposing weakness of the damaged ear. Moreover, there is nothing in the evidence to show whether petitioner's swim was more than a single plunge. There is certainly nothing to justify the acceptance of the unqualified fact of a swim in a pool as establishing a new efficient cause, in the face of what Drs. Dias and Koppel say about the origin and nature of the repuncture, plus the proofs of the primary injury. There is no justification for any change in the findings of the Bureau.

The determination below is affirmed, in all respects.

Allowances will be made upon notice when the determination in this court is presented for signature.